**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**DORETHA WITHERSPOON,**

                      **Plaintiff,**

  vs.                                        1:19-CV-01440
                                                         (MAD/TWD)

**NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, ANTHONY J. ANNUCCI**, *in his official capacity and individually*, **STEVEN MAHER**, *in his official capacity and individually*, **CHRISTIAN NUNEZ**, *in his official capacity and individually*, **JOHN SHIPLEY**, *in his official capacity and individually*, **MATT BLOOMINGDALE**, *in his official capacity and individually*,

                      **Defendants.**

---

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **LIPPES MATHIAS LLP**<br>54 State Street, Suite 1001<br>Albany, New York 12207<br>Attorneys for Plaintiff | **CONOR E. BROWNELL, ESQ.** |
| **OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL**<br>The Capitol<br>Albany, New York 12224<br>Attorneys for Defendants | **JONATHAN REINER, AAG**<br>**LYNN MARIE KNAPP, AAG** |

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

    Plaintiff Doretha Witherspoon commenced this action on November 20, 2019, asserting violations of the Genetic Information Non-Discrimination Act ("GINA") and the Fourth Amendment's protection from unreasonable searches and seizures against Defendant New York

State Department of Corrections and Community Supervision ("DOCCS"). *See* Dkt. No. 1. Plaintiff subsequently amended the complaint to assert (1) a cause of action under GINA for unlawful *acquisition* of genetic information against DOCCS, *see* 42 U.S.C. § 2000ff-1(b); (2) a cause of action under GINA for unlawful *disclosure* of genetic information against DOCCS, *see* 42 U.S.C. § 2000ff-5(b); and (3) a cause of action for unreasonable search and seizure under the Fourth Amendment against Defendants Anthony J. Annucci, Steve Maher, Christian Nunez, John Shipley, and Matt Bloomingdale, each in their individual and official capacities, *see* 42 U.S.C. § 1983. *See* Dkt. No. 13. The amended complaint seeks both damages and injunctive relief against DOCCS, and only injunctive relief against the individual Defendants. *See id.* at 7-8.

Currently before the Court is Plaintiff's partial motion for summary judgment as to liability on its first and second causes of action, *see* Dkt. No. 47, and Defendants' separate motion for summary judgment dismissing all three of Plaintiff's causes of action, *see* Dkt. No. 50. For the reasons that follow, Plaintiff's motion is denied and Defendants' motion is granted.

## II. BACKGROUND[1]

Defendants DOCCS is an agency of the State of New York charged with the care, custody and control of inmates. *See* Dkt. No. 47-4 at 27. At all times relevant to this action, Plaintiff was employed by DOCCS as a correction officer at the Green Haven Correctional Facility ("Green Haven"). *See id.* Defendant Annucci was the acting Commissioner and chief executive officer of DOCCS. *See id.* at 28. Defendant Maher was the Chief of Investigations for the DOCCS Office of Special Investigations ("OSI"); Defendant Nunez was the Deputy Chief of Investigations for the Sex Crimes Division of OSI; Defendant Shipley was the Director of the DOCCS Bureau of

---

[1] The facts discussed below are derived from the parties' joint stipulation of facts, *see* Dkt. No. 47-4 at 27-34, and the uncontested portions of the statements of material fact, *see* Dkt. Nos. 47-3, 50-2.

Labor Relations ("BLR"); and Defendant Bloomingdale was a DOCCS employee and member of BLR. *See id.*

On or about April 8, 2018, during a routine search of a male inmate's cell at Green Haven, correction officers discovered a plastic bag containing a pair of women's underwear with what appeared to be a dried substance on the crotch area. *See id.* Male inmates are not allowed to possess women's underwear. *See* Dkt. No. 50-2 at 3. After discovery of this contraband, OSI assigned nonparty OSI Investigator Jessica McNair to investigate and report on any unauthorized relationship that may have given rise to the inmate's possession of the underwear. *See* Dkt. No. 47-4 at 28.[2] During a subsequent interview with Investigator McNair, the inmate claimed that Plaintiff had given him the underwear on April 7, 2018. *See id.* at 29. The inmate consented to a request for a buccal swab[3] for DNA forensic analysis. *See id.*

On April 9, 2018, Plaintiff was frisked at Green Haven and placed on administrative leave pending further investigation. *See id.* No contraband was found during the search of Plaintiff. *See id.* Meanwhile, Investigator McNair conducted interviews with other inmates, but failed to find any witness of the alleged interaction between the inmate and Plaintiff. *See id.* On April 11, 2018, a second inmate submitted a written complaint concerning Plaintiff to DOCCS. *See id.* The inmate was interviewed and provided information regarding staff members selling underwear and providing sexual favors to inmates, and claimed that Plaintiff "'got caught selling her underwear because she got sloppy.'" *Id.*

---

[2] Because of the disparate power dynamic between corrections officers and incarcerated individuals, state and federal law proscribe any kind of sexual relationship between incarcerated individuals and correction staff. *See, e.g.*, 28 C.F.R. § 115.6.

[3] "A buccal swab collects DNA by rubbing a Q-tip-like swab on the inside of a person's cheek." Dkt. No. 47-4 at 33.

3

Investigator McNair interviewed Plaintiff on October 9, 2018. *See id.* at 30. Plaintiff denied having any personal conversations or any sexual or physical contact with the inmate in possession of the underwear. *See id.* When Investigator McNair asked Plaintiff to provide a DNA sample for forensic analysis, Plaintiff declined. *See id.* OSI then directed Plaintiff to report to DOCCS' training academy on November 21, 2018 for continued interrogation pursuant to DOCCS Directive 0102 (the "interrogation"). *See id.* at 30, 67-69. Plaintiff's attorney, Defendants Nunez and Bloomingdale, and a number of other individuals were present for the interrogation and Plaintiff was given a *Garrity* warning.[4] *See id.* at 30-31. Plaintiff continued to deny acting inappropriately with any inmate. *See id.* at 31, 38-65. At the conclusion of the questioning, Defendant Nunez gave Plaintiff a direct order to provide a DNA sample via buccal swab. *See id.* at 31. Plaintiff's counsel objected, noting that they did not know any other "time when an officer has been compelled in an interrogation to give a DNA sample." *See id.* at 49-50. Ultimately, however, Plaintiff complied with the direct order given to her by Defendant Nunez and provided a buccal swab containing evidence of her DNA, which Investigator McNair placed into an evidence box. *See id.* at 31. Because DOCCS lacks the ability to conduct DNA analysis, both Plaintiff's and the inmate's buccal swabs were sent to the New York State Police Forensic Investigation Center ("SPFIC") for comparison with the DNA on the underwear. *See id.* at 32.

On December 31, 2018, SPFIC produced a Biological Sciences Case Report (the "report") which concluded that the DNA found on the underwear did not match either set of DNA. *See id.*; *see also* Dkt. No. 51 at 3-5. The report was provided to OSI and Plaintiff's DNA sample was returned to DOCCS for frozen storage. *See* Dkt. No. 47-4 at 32. On April 9, 2019,

---

[4] *See Garrity v. New Jersey*, 385 U.S. 493, 500 (1967) (holding that the Fourteenth Amendment "prohibits use in subsequent criminal proceedings of statements [by public employees] obtained under threat of removal from office").

Investigator McNair produced an Investigative Report classifying the allegations as unsubstantiated and closing the investigation. *See id.* at 33. On May 17, 2019, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that she had been discriminated against in violation of GINA. *See* Dkt. No. 47-4 at 73-74. The EEOC issued a notice of dismissal and right to sue on August 20, 2019. *See id.* at 77-78. Plaintiff commenced the present action on November 20, 2019.

Plaintiff now moves for partial summary judgment on liability for her first and second causes of action, arguing that the undisputed facts of this case establish, as a matter of law, that Defendants illegally requested and disclosed her genetic information in violation of GINA. *See* Dkt. No. 47. Defendants oppose Plaintiff's motion, *see* Dkt. No. 54, and separately move for summary judgment dismissing the entire amended complaint. *See* Dkt. No. 50.

### III. DISCUSSION

**A.    Standard of Review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36

(citing *Anderson*, 477 U.S. at 255) (other citations omitted).  Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute.  *See Anderson*, 477 U.S. at 258.

The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case.  *See id.* at 325.  Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R. Civ. P. 56(e).

**B.     Subject Matter Jurisdiction – Standing**

Defendants argue that Plaintiff does not have standing to seek injunctive relief for any cause of action because "no evidence demonstrates any likelihood that Plaintiff would again be subject to the conduct of which she complains."  Dkt. No. 57 at 4.  Plaintiff opposes this argument, asserting that certain statements made by Defendant Nunez during Plaintiff's interrogation reveal "an ongoing violation."  Dkt. No. 47-1 at 14-15.

"It is axiomatic that federal courts are courts of limited jurisdiction and may not decide cases over which they lack subject matter jurisdiction," *Lyndonville Sav. Bank & Tr. v. Lussier*, 211 F.3d 697, 700 (2d Cir. 2000), and "standing 'is perhaps the most important of the jurisdictional doctrines.'"  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted); *see also Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) ("If [a plaintiff] lacks standing, we lack subject matter jurisdiction to entertain a request for [injunctive] relief").  If a court does not have subject matter jurisdiction, the action must be dismissed.  Fed. R. Civ. P. 12(h)(3).  The plaintiff, as the party invoking the court's jurisdiction, bears the burden of establishing standing.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).  "[A]

plaintiff must demonstrate standing for each claim [he or she] seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

Where, as here, a plaintiff seeks injunctive or declaratory relief, she "must carry the burden of establishing that '[she] has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'" *Shain*, 356 F.3d at 215 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983)). In other words, "an allegation of future injury will be sufficient only if 'the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Dorce v. City of New York*, 2 F.4th 82, 95 (2d Cir. 2021) (quoting *Susan B. Anthony List*, 573 U.S. at 158). In making this showing, a plaintiff "'cannot rely on past injury to satisfy the injury requirement but must show a likelihood that [she] will be injured in the future.'" *Id.* (quoting *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)). "Finally, abstract injury is not enough; rather, '[t]he injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical."'" *Shain*, 356 F.3d at 215 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).

Although it is clear that Plaintiff has standing with respect to her damages claim, Plaintiff has not established that there is a real and immediate threat of future warrantless genetic tests under the circumstances alleged in her claim. The OSI investigation that prompted the warrantless buccal swab demand has been closed and the allegations therein determined to be unsubstantiated, and Plaintiff does not allege that she is either currently or likely in the future to be the subject of another similar OSI investigation. Indeed, Defendants allege—and Plaintiff does not contest—that "[i]n the nearly-three years since the search and nearly-two years during the pendency of this action, no DOCCS employee has taken or attempted to take any DNA sample from Plaintiff without a warrant." Dkt. No. 50-1 at 20 (citing Dkt. No. 50-4 at 5).

In support for her claim of an "ongoing violation," Plaintiff argues that certain statements made by Defendant Nunez during her interrogation reveal "regular collection of DNA for use in administrative proceedings, and nothing to stop DOCCS from violating the rights conferred by GINA to other members of Plaintiffs putative class." Dkt. No. 47-1 at 14-15. During the interrogation, Defendant Nunez stated that

> [T]he evidence that's going to be collected today, again, is going to be handled under the administrative *Garrity* Protection. So it's – like I said before, it's not going to be used in any criminal proceedings. The evidence that's going to be collected today is going to be handled in accordance with DOCCS and OSI policy. Investigator McNair is trained in the collection of DNA samples. Its something that we do particularly in the Sex Crimes Division, probably on a weekly basis, and all our people are trained to do so appropriately, and its been used in both administrative and criminal proceedings in the past.

Dkt. No. 47-4 at 51-52. The Court finds that Defendant Nunez's statement that the Sex Crimes Division collects DNA samples on a weekly basis does not, in any way, establish that DOCCS or OSI intend to pursue warrantless genetic tests against Plaintiff in the future. The reference to the collection of DNA samples could just as easily refer to the collection of DNA samples pursuant to valid warrants or from consenting parties—an interpretation bolstered by Plaintiff's failure to allege any other instance of a warrantless genetic test like the one that gave rise to this action.[5]

Accordingly, the portion of Defendants' motion for summary judgment seeking to dismiss Plaintiff's claims for injunctive relief, under both GINA[6] and the Fourth Amendment, is granted.

---

[5] The Court also rejects Plaintiff's argument that Defendants have evinced an intention to conduct warantless DNA tests in the future by arguing in present motions that their actions did not violate GINA or the Fourth Amendment. *See* Dkt. No. 53 at 23. Defendants are entitled to make arguments concerning the merits of this action without conceding this issue.

[6] There is some dispute as to whether the Court should read into the amended complaint a request for injunctive relief against the individual Defendants under GINA, in addition to the amended complaint's more clearly pled requests for injunctive relief against DOCCS under GINA

8

The portion of Plaintiff's motion for partial summary judgment seeking injunctive relief under GINA is denied.

C.     **Eleventh Amendment**

Defendants argue that the Eleventh Amendment bars Plaintiff from recovering damages under GINA because Congress may only override a state's sovereign immunity under statutes enacted pursuant to the Equal Protection Clause of the Fourteenth Amendment.  *See* Dkt. No. 54 at 10-11.  Defendants contend that "the text and record of GINA demonstrate that Congress enacted GINA pursuant to its Article I, Section 8 authority to regulate interstate commerce," *id.* at 11, and otherwise failed to properly identify a history and pattern of unconstitutional employment discrimination by the States, *see* Dkt. No. 57 at 4-9.  In opposition, Plaintiff argues that Congress validly abrogated the states' sovereign immunity under the Fourteenth Amendment and adequately identified a history and pattern of unconstitutional employment discrimination under the standard articulated for classifications subject to a heightened level of judicial scrutiny.  *See* Dkt. No. 56 at 10-13.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

---

and against the individual Defendants under the Fourth Amendment.  *See* Dkt. No. 54 at 12; Dkt. No. 56 at 15.  The Court finds that considerations of delay and prejudice here weigh against reading a new cause of action into the amended complaint at this late stage in the litigation.  *See Berman v. Parco*, 986 F. Supp. 195, 219 (S.D.N.Y. 1997) ("'When the motion is made after discovery has been completed and a motion for summary judgment has been filed, leave to amend is particularly disfavored because of the resultant prejudice to [the] defendant'") (quotation omitted); *see also DeCastro v. City of New York*, No. 16-CV-3850, 2020 WL 4932778, *10 (S.D.N.Y. Aug. 24, 2020) (collecting similar cases).  However, even if the Court were inclined to credit Plaintiff's argument, this cause of action would be dismissed along with Plaintiff's other requests for injunctive relief, for the reasons stated above.  Additionally, injunctive relief is unavailable against the Defendants in their individual capacities under Section 1983.

Although the Eleventh Amendment bars actions for damages asserted by private persons against a state in federal court, "there are two recognized exceptions to the bar: when Congress authorizes such a suit through enforcement of § 5 of the Fourteenth Amendment, and where a state consents to being sued." *McGinty v. New York*, 251 F.3d 84, 91 (2d Cir. 2001) (citing *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999); *Hans v. Louisiana*, 134 U.S. 1, 15 (1890)).

DOCCS, an agency of the State of New York, benefits from Eleventh Amendment immunity. *See Mary Jo C. v. New York State & Local Ret. Sys.*, 707 F.3d 144, 152 (2d Cir. 2013) ("The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state"); *Johnson v. New York*, No. 10-CV-9532, 2012 WL 335683, *1 (S.D.N.Y. Feb. 1, 2012) ("DOCCS is an arm of the state. Consequently, [the] plaintiff's claims against ... DOCCS, an agency of the State of New York, are barred by the Eleventh Amendment"). Because there is no allegation that New York State has consented to being sued, DOCCS is only subject to a suit for damages if Congress validly abrogated DOCCS' Eleventh Amendment immunity. "To determine whether Congress properly abrogated states' Eleventh Amendment immunity, two questions are asked." *McGinty*, 251 F.3d at 91 (citation omitted). "First, did Congress unequivocally express its intent to abrogate immunity? And second, did Congress act pursuant to a valid grant of constitutional authority?" *Id.* (citing *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 55, 59 (1996)).

### 1. Intent

"Congress' intent to abrogate the States' immunity from suit must be obvious from 'a clear legislative statement.'" *Seminole Tribe of Florida*, 517 U.S. at 55 (quoting *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 786 (1991)). "'To temper Congress' acknowledged powers of

abrogation with due concern for the Eleventh Amendment's role as an essential component of our constitutional structure,'" the Supreme Court has "'applied a simple but stringent test: Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.'" *Id.* at 56 (quotation omitted).

A handful of district courts have examined this issue and held that the language of GINA clearly evidences Congress' intention for GINA to apply to the states and abrogate Eleventh Amendment immunity. *See Leming v. Oklahoma Dept. of Veterans Affairs*, No. 18-CV-348, 2018 WL 5929644, *3 (W.D. Okla. Nov. 13, 2018); *Allen v. New Jersey, Pub. Def.*, No. 16-CV-8661, 2017 WL 3086371, *7 n.9 (D.N.J. July 20, 2017); *Culbreth v. Washington Metro. Area Transit Auth.*, No. 10-CV-3321, 2012 WL 959385, *4 (D. Md. Mar. 20, 2012). The Court finds the reasoning in those cases to be persuasive. As they noted, Congress included "an entity employing a State employee" within the definition of an "employer" and a "State employee" within the definition of "employee." 42 U.S.C. §§ 2000ff(2)(A)(ii), (B)(ii). Furthermore, both of those sections explicitly incorporated language from an amendment to Title VII that extended that statute's coverage to government employees. *See* 42 U.S.C. §§ 2000ff(2)(A)(ii), 2000ff(2)(B)(ii) (incorporating 42 U.S.C. § 2000e-16c(a)); *see also* H.R. Rep. No. 110-28, pt. 1, at 39 (2007) ("[T]he [GINA] legislation expressly covers state employees"). Defendants do not challenge this conclusion. Instead, Defendants argue that Congress did not act pursuant to a valid grant of constitutional authority.

### 2. Grant of Constitutional Authority

In GINA's legislative history, several House committees state that GINA was enacted under Article I, section 8, clause 1 and clause 3, as well as the Sixteenth Amendment to the

11

Constitution. *See* H.R. Rep. No. 110-28, pt. 1, at 49; H.R. Rep. No. 110-28, pt. 2, at 32; H.R. Rep. No. 110-28, pt. 3, at 32; S. Rep 110-28, pt. 1.  However, Congress may only "abrogate a State's sovereign immunity when it does so pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment to enforce the substantive guarantees of that Amendment." *Tennessee v. Lane*, 541 U.S. 509, 518 (2004); *see also Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 364 (2001) ("Congress may not ... base its abrogation of the States' Eleventh Amendment immunity upon the powers enumerated in Article I"); *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 79 (2000) ("[I]f the ADEA rests solely on Congress' Article I commerce power, the private petitioners in today's cases cannot maintain their suits against their state employers").  Congress need not "recite the words 'section 5' or 'Fourteenth Amendment' or 'equal protection,'" before a court can examine whether Congress validly exercised its power under § 5 because "'[the] ... constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *EEOC v. Wyoming*, 460 U.S. 226, 243 n.18 (1983) (quotation omitted). "Valid § 5 legislation must exhibit 'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 728 (2003) (quoting *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997)).

"The first step in applying these now familiar principles is to identify with some precision the scope of the constitutional right at issue." *Garrett*, 531 U.S. at 366.  The relevant portions of GINA provide that it shall be an unlawful employment practice for an employer to "request, require, or purchase genetic information with respect to an employee or a family member of the employee," 42 U.S.C. § 2000ff-1(b), and that an "employer ... shall not disclose genetic information concerning an employee," *id.* § 2000ff-5(b).  This provision directly implicates "[t]he constitutionally protected privacy interest in avoiding disclosure of personal matters," which

"clearly encompasses medical information and its confidentiality." *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1269 (9th Cir. 1998) (citations omitted); *see also* Harper Jean Tobin, *The Genetic Information Nondiscrimination Act of 2008: A Case Study of the Need for Better Congressional Responses to Federalism Jurisprudence*, 35 J. LEGIS. 113, 127 (2009). Both the Supreme Court and the Second Circuit have recognized a fundamental right to a "zone of privacy" that "protects 'the individual interest in avoiding disclosure of personal matters'" including "information about one's body." *Hancock v. County of Rensselaer*, 882 F.3d 58, 65 (2d Cir. 2018) (quoting *Whalen v. Roe*, 429 U.S. 589, 599 (1977); *see also Griswold v. Connecticut*, 381 U.S. 479, 485 (1965)); *Doe v. Marsh*, 918 F. Supp. 580, 585 (N.D.N.Y. 1996), *aff'd*, 105 F.3d 106 (2d Cir. 1997) (citing *Doe v. City of New York*, 15 F.3d 264, 269 (2d Cir. 1994)).

For the second step, the Court must "examine whether Congress identified a history and pattern of unconstitutional employment discrimination by the States." *Garrett*, 531 U.S. at 368. "One means by which we have made such a determination in the past is by examining the legislative record containing the reasons for Congress' action." *Kimel*, 528 U.S. at 88 (citations omitted). The type and amount of evidence in the legislative record sufficient to justify a congressional response depends on the constitutional rights implicated by the legislation and what level of judicial scrutiny those rights warrant. Where the targeted classifications are subject to rational-basis review, the Supreme Court has applied a strict standard for the type of evidence it will consider in the legislative record, requiring evidence of a widespread pattern of unconstitutional discrimination by state governments. *See id.* at 90-91 (emphasizing that Congress must make findings of a "widespread pattern" of "*unconstitutional* ... discrimination" "by the states," and noting that Congress' finding of "substantial age discrimination in the private sector" was "beside the point"); *see also Garrett*, 531 U.S. at 369. However, where the targeted

classifications are subject to "a heightened standard of judicial scrutiny," the Supreme Court has determined that "it [is] easier for Congress to show a pattern of state constitutional violations." *Lane*, 541 U.S. at 528-29; *see also Hibbs*, 538 U.S. at 736.  Under this relaxed standard, a court may consider "the conduct of nonstate governments," *Lane*, 541 U.S. at 527 n.16, and evidence regarding private sector actors, *see Hibbs*, 538 U.S. at 731.

Because this Court has concluded that GINA implicates a fundamental right subject to a heightened standard of judicial scrutiny, Congress is subject to the more relaxed evidentiary requirements detailed in *Hibbs* and *Lane*.  *See Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 460 (2d Cir. 1996) ("When the right infringed is 'fundamental,' the governmental regulation must be 'narrowly tailored to serve a compelling state interest'") (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)).  However, the Court finds that the limited evidence advanced by Congress in support of GINA does not satisfy even this more liberal standard.

Congress initially finds that, "[b]y 1981, a majority of States adopted sterilization laws to 'correct' apparent genetic traits or tendencies," and, during the 1970s, states began to enact discriminatory laws "to screen and identify carriers of sickle cell anemia, a disease which afflicts African-Americans ... leading to discrimination and unnecessary fear."  Pub. L No. 110–233, § 2, 122 Stat. 881, 882 (2008).  However, Congress then immediately undermines the relevance of those findings by noting that "[m]any of these State [sterilization] laws have since been repealed, and many have been modified to include essential constitutional requirements of due process and equal protection," and that Congress passed the National Sickle Cell Anemia Control Act in 1972, "which withholds Federal funding from States unless sickle cell testing is voluntary."  *Id.*; *see also* H.R. Rep. No. 110-28, pt. 1, at 30 ("To date, 34 states have passed laws on genetic discrimination in employment and 46 have passed laws on genetic discrimination in health

insurance").  The findings also state that Congress "has been informed of examples of genetic discrimination in the workplace," but only points to a single instance of such discrimination—the "use of preemployment genetic screening at Lawrence Berkeley Laboratory," which led to the Ninth Circuit's decision in *Norman-Bloodsaw*.  *Id.*

The committee reports associated with GINA do not provide much additional support.  The House Education and Labor Committee report cites to a number of studies on the public's concerns about employer access to genetic information, but the public's concerns do not necessarily arise from an existing pattern of employment discrimination.  *See* H.R. Rep. No. 110-28, pt. 1, at 28-29.  The report also notes that the "Supreme Court's earliest decision on the constitutionality of state sterilization statutes," *Skinner v. Oklahoma*, 316 U.S. 535 (1942), "has never been officially overruled," but then notes that *Skinner* "certainly does not reflect contemporary norms."  H.R. Rep. No. 110-28, pt. 1, at 40.  The House Energy and Commerce Subcommittee on Health points to a 1998 joint report put forth by the Department of Labor, the Department of Health and Human Services, the EEOC, and the Department of Justice, which "summarized the various studies on discrimination based on genetic information" and stated that "genetic predisposition or conditions can lead to workplace discrimination."  H.R. Rep. No. 110-28, pt. 3, at 27.  It is not clear from the Subcommittee's report, however, to what extent that the 1998 joint report reflected an analysis of existing discrimination, or a prediction of potential future discrimination.

The sparse evidence of genetic discrimination in this case stands in sharp contrast to the amount of evidence in *Hibbs* and *Lane*.  In *Hibbs*, the Supreme Court examined the Congressional support for the Family and Medical Leave Act under the same standard and found that Congress had (1) relied on Bureau of Labor Statistics surveys showing a widening of the gender gap in the

private sector, (2) heard testimony on the rarity of parental leave for fathers and "rampant" sex discrimination, and (3) found both historical and contemporary "shortcomings" in many states' policies. *See Hibbs*, 538 U.S. at 730-34. With respect to the public services provisions of the Americans with Disabilities Act in *Lane*, the Supreme Court found that Congress had (1) identified an "extensive record of disability discrimination" in public services, (2) noted that "a number of States have prohibited and continue to prohibit persons with disabilities from engaging in activities such as marrying and serving as jurors," (3) identified "hundreds of examples of unequal treatment of persons with disabilities" under existing state laws, (4) "learned that many individuals, in many States across the country, were being excluded from courthouses and court proceedings by reason of their disabilities," and (5) appointed a task force which heard "numerous examples of the exclusion of persons with disabilities from state judicial services and programs." *Lane*, 541 U.S. at 524-29.

In sum, Congress has not identified an existing pattern or practice of discrimination on the basis of genetics. Therefore, "even if Congress intended to act pursuant to Section 5, the legislation is not congruent or proportional to the injury, and any abrogation of Eleventh Amendment immunity was ineffective." *Culbreth*, 2012 WL 959385, at *6.

Accordingly, the portion of Defendants' motion for summary judgment seeking to dismiss Plaintiff's GINA claim for damages under the Eleventh Amendment is granted. The portion of Plaintiff's motion for partial summary judgment seeking damages under GINA is denied.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Plaintiff's partial motion for summary judgment (Dkt. No. 47) is **DENIED**;

and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 50) is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's claims are **DISMISSED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: June 21, 2022
Albany, New York

_____
Mae A. D'Agostino
U.S. District Judge